**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**
**TOLEDO, OHIO**

| | | |
|---|---|---|
| Joshua Chisholm, Individually; | : | |
| | : | |
| Dane Chisholm, former student-athlete of St. Marys City Schools; | : | |
| | : | |
| David Lininger, Individually and on behalf of R.L., a minor, former student-athlete of St. Marys City Schools; | : | JUDGE_____ |
| | : | |
| Levi Ginter, former student-athlete of St. Marys City Schools; | : | CASE NO: _____ |
| | : | |
| Jase Green, former student-athlete of St. Marys City Schools; | : | |
| | : | |
| and | : | |
| | : | |
| Chance Hicks, former student-athlete of St. Marys City Schools, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| St. Marys City School District Board of Education; | : | |
| | : | |
| Shawn Brown, Individually and as Superintendent of St. Marys City Schools; | : | |
| | : | |
| James Hollman, Individually and as Athletic Director of St. Marys City Schools; | : | |
| | : | |
| Paul Douglas Frye, a.k.a. Doug Frye, Individually and as Head Football Coach of St. Marys City Schools; | : | |
| | : | |

```
and                                      :
                                         :
Bo Frye, Individually and as Assistant   :
Football Coach of St. Marys City Schools, :
                                         :
          Defendants.                    :
```

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs hereby allege against the Defendants:

## OVERVIEW

1. The Plaintiffs are five former high school football players in the St. Marys City School District ("the District") and two fathers of the players. The football players were talented and accomplished, but nonetheless subjected to regular, repeated and pervasive harassment, intimidation, bullying and humiliation by Defendants Doug Frye and Bo Frye, who served as the District's head football coach and assistant football coach, respectively.

2. During the 2014-15 and 2015-16 school years, the players and other teammates were repeatedly referred to as "pussy," "pussycake," and "bitch," among other derogatory and demeaning terms used by the Defendant coaches. The Defendant coaches created an environment in which these and other expletives were commonly directed at players, where players were constantly pressured to play with injuries, where players were instructed that, "what happens in football, stays in football," and where players were encouraged to disassociate themselves from those who outwardly resisted the negative treatment by the coaches.

3.    In one case, Plaintiff Chance Hicks suffered a serious re-injury to his shoulder while taking a hit during a supposed non-contact practice. Plaintiff Hicks was forced to practice despite a recent shoulder surgery and medical excuse excluding him from practice. Because of this, Hicks seriously re-injured his shoulder and sustained lifelong damage.

4.    At the same practice, Hicks was called a "little bitch" by Defendant Bo Frye and required to run while injured because he could not participate.

5.    All of the Plaintiffs were retaliated against for reporting the harassment to Defendant-Superintendent, Shawn Brown, and Defendant-Athletic Director, James Hollman.

6.    Defendants Brown and Hollman had full knowledge that Defendant Doug Frye had previously harassed, intimidated, bullied and humiliated student-athletes. Defendant Hollman had himself reported the coach for this behavior to the Board of Education several years earlier. Defendant Brown received numerous pieces of information about the coach's egregious language and behavior immediately before the coach was re-hired by the District in 2014.

7.    Nonetheless, Defendant Brown intentionally and recklessly ignored the warnings and recruited the coach for re-employment. Defendant Brown recommended to the Board of Education that the coach be re-hired, and following the hiring, Defendant Brown intentionally and recklessly failed to monitor or supervise the coach.

8.    During the coach's candidacy and re-hire in 2014, Defendant Hollman remained silent about the coach's known disposition for harassing and bullying players, and,

following the hiring, intentionally and recklessly failed to monitor or supervise the coach. Defendants Brown and Hollman "turned a blind eye" to the actions and "old school" motivational methods of Defendant Doug Frye.

9.  Because Defendant Doug Frye had a history of winning football games and was beloved by certain members of the community, Defendants Brown and Hollman intentionally and recklessly disregarded and/or ignored complaints and concerns expressed about the coach prior to and subsequent to the coach's re-hiring. Defendants Brown and Hollman also intentionally and recklessly dismissed or disregarded complaints made by the Plaintiffs about Defendants Doug Frye and Bo Frye. Defendants were deliberately indifferent to the known harassment.

10.  Defendant St. Marys City School District Board of Education ("Board of Education") knew that Defendant Doug Frye had harassed, intimidated, bullied and humiliated students, but nonetheless recklessly and intentionally re-hired the coach in 2014 and failed to supervise the coach thereafter. The Board of Education intentionally and recklessly disregarded and/or ignored written and oral concerns expressed about the coach prior to and subsequent to the coach's re-hiring. This included harassment complaints made directly to the Board of Education by parents and assistant football coaches. The Board of Education also ignored discipline imposed upon the coach by former employers and the Ohio Department of Education. The Board of Education also ignored more recent complaints made by the Plaintiffs about Defendants Doug Frye and Bo Frye.

11. Defendants Board of Education, Brown and Hollman created a more dangerous situation for the student-Plaintiffs because these Defendants demonstrated a willful disregard for the known disposition and methods of Doug Frye and were deliberately indifferent to known harassment and retaliation. The Defendants' apathy towards the Plaintiffs' complaints created an environment in which Plaintiffs were subjected to increased harassment and retaliation by the coaches, students and community members.

12. Despite the adoption of written anti-bulling and harassment policies, it was the regular practice and procedure of all Defendants to disregard the policies by ignoring, minimizing or rejecting any complaints made about Defendants Doug Frye and Bo Frye. Defendants also failed to address known retaliation taken against the Plaintiffs for reporting the coaches' conduct.

13. Plaintiffs have suffered substantial physical, psychological and/or emotional injuries from the repeated harassment, intimidation, bullying, humiliation and retaliation. Plaintiffs Joshua Chisholm, Dane Chisholm, David Lininger and his son R.L., all lifelong residents of the District, have relocated out of the District because of the negative treatment they received.

14. The Defendants' reckless and intentional conduct constitutes, *inter alia*, a violation of the Plaintiffs' rights to due process and equal protection under the Fourteenth Amendment of the U.S. Constitution. The Defendants' conduct has deprived all student-Plaintiffs of the benefits of a public education.

15.     The harassment and retaliation in question was severe, pervasive and objectively offensive, and occurred because of student-Plaintiffs' gender, as the same actions by the coaches would not have been tolerated if the coaches had been coaching female athletes. The harassment and retaliation was grounded in the coaches' regular and repeated use of the words "pussy," "pussycake" and "bitch," and based on gender stereotypes and/or traditional notions of masculinity and/or femininity, which constitutes gender-based discrimination under Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, *et. seq.* ("Title IX").

## JURISDICTION AND VENUE

16.     This Court has exclusive jurisdiction over this matter pursuant to 28 U.S.C. § 1331 insofar as this Complaint raises issues under the First and Fourteenth Amendments to the United States Constitution and Title IX. Plaintiffs bring these claims by and through 42 U.S.C. § 1983 and 28 U.S.C. § 1343.

17.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 because the state law claims asserted by Plaintiffs form part of the same case or controversy as the constitutional/federal claims.

18.     Venue is proper in the Northern District of Ohio, Western Division, under 18 U.S.C. § 1965 and 28 U.S.C. 1391(c), as the claims arise in this district and all Defendants reside or maintain a principal place of business within the district.

## PARTIES

19.     PLAINTIFF JOSHUA CHISHOLM is an adult residing in Allen County, Ohio and natural parent of Dane Chisholm.

20.   PLAINTIFF DANE CHISHOLM is a student-athlete and football player who formerly attended St. Marys High School, a school operated by the Defendant Board of Education. Dane Chisholm attended St. Marys High School for all times relevant herein until graduation on May 29, 2016. Dane Chisholm currently resides in Allen County, Ohio.

21.   PLAINTIFF LEVI GINTER is a student-athlete and football player who formerly attended St. Marys High School. Levi Ginter attended St. Marys High School for all times relevant herein until graduation on May 29, 2016. Levi Ginter currently resides in Auglaize County, Ohio.

22.   PLAINTIFF JASE GREEN is a student-athlete and football player who formerly attended St. Marys High School. Jase Green attended St. Marys High for all times relevant herein until graduation on May 29, 2016. Jase Green currently resides in Auglaize County, Ohio.

23.   PLAINTIFF CHANCE HICKS is a student-athlete and football player who formerly attended St. Marys High School. Plaintiff attended St. Marys High School for all times relevant herein until graduation on or about May 25, 2015. Chance Hicks currently resides in Auglaize County, Ohio.

24.   PLAINTIFF DAVID LININGER is an adult residing in Shelby County, Ohio and natural parent of R.L., age 17. Plaintiff David Lininger is suing on his own behalf and on behalf of his minor son, R.L. R.L. is a minor student-athlete and football player who formerly attended St. Marys High School. R.L. attended St. Marys

7

High School for all times relevant herein until he transferred on April 1, 2016. R.L. currently resides in Shelby County, Ohio.

25.     DEFENDANT BOARD OF EDUCATION is a political subdivision of the state of Ohio with its administrative office and principal place of business located at 100 West Spring Street, St. Marys, Ohio 45885 in Auglaize County, Ohio. The Board of Education receives federal and state funding for the provision of public education.

26.     DEFENDANT JAMES HOLLMAN, at all times relevant herein, was employed by the Board of Education in the position of Athletic Director and, upon information and belief, resides at 594 Glynwood Road, St. Marys, Ohio 45885 in Auglaize County, Ohio. Defendant Hollman was acting under color of law and was responsible for the implementation of all official governmental laws, policies, regulations and procedures. Defendant Hollman was a supervisor of Defendant Doug Frye. Defendant Hollman is being sued in his official and individual capacities.

27.     DEFENDANT SHAWN BROWN, at all times relevant herein, was employed by the Board of Education in the position of Superintendent and, upon information and belief, resides at 81 Southmoor Shores Drive, St. Marys, Ohio 45885 in Auglaize County, Ohio. Defendant Brown was acting under color of law and was responsible for the implementation of all official governmental laws, policies, regulations and procedures. Defendant Brown was a supervisor of Defendant

Doug Frye. Defendant Brown is being sued in his official and individual capacities.

28. DEFENDANT PAUL DOUGLAS FRYE, a.k.a. Doug Frye, at all times relevant herein, was employed by the Board of Education in the position of head football coach and teacher and, upon information and belief, resides at 598 Locust Street, St. Marys, Ohio 45885 in Auglaize County, Ohio. Defendant Doug Frye was acting under color of law. Defendant Doug Frye is being sued in his official and individual capacities.

29. DEFENDANT BO FRYE, at all times relevant herein, was employed by the Board of Education in the position of assistant football coach and, upon information and belief, resides at 702 Magnolia Street, St. Marys, Ohio 45885 in Auglaize County, Ohio. Defendant Bo Frye was acting under color of law. Defendant Bo Frye is being sued in his official and individual capacities.

30. All Defendants were acting under color of state law.

## FACTS

31. As Head Coach of the District's high school football team, Defendant Doug Frye enjoyed a position of authority and trust. Defendant Doug Frye was provided regular, unsupervised and unmonitored access and control over the District's high school football players. This access and control was provided by the Defendants Board of Education, Brown and Hollman, even though Defendants had full knowledge of the coach's nearly 20-year history of berating, harassing, intimidating and bullying his players.

9

32.   Doug Frye's first stint as Head Coach in the District began in 1998. Immediately prior to coming to St. Marys, Defendant Doug Frye served as coach at Bucyrus City Schools.

**Doug Frye Employment and Discipline at Bucyrus City Schools**

33.   On October 12, 1995, while at Bucyrus City Schools, the coach was given a written reprimand by the district's Superintendent for "a confrontation with one of your players which resulted in you [Doug Frye] using unacceptable obscene language as well as becoming physical with one of the players."

34.   The Superintendent's letter referenced the "sheer number of reports of the use of obscene language, including the 'F' word, by you [Doug Frye] and your coaches."

35.   This disciplinary letter was included in Defendant Doug Frye's personnel file maintained by the Bucyrus City Schools and was a public record. The Defendants knew or should have known of this record.

**Doug Frye Initial Employment at St. Marys;**
**Harassment Reports by Assistant Coaches**

36.   After becoming employed as head football coach at St. Marys City Schools for the first time in 1998, the District's then-Athletic Director, Steve Moor, indicated to Doug Frye on his employment evaluation, dated December 7, 1999, that he should, "refrain from using degrading comments/language that can impact a young man's self esteem or set an inappropriate example." Defendants knew of this record.

37.  On September 5, 2000, a local physician, Dr. James Kemmler, delivered a letter to Defendant Doug Frye outlining concerns for football players who were forced to play prior to receiving medical releases to do so. The letter provided, in part, as follows:

> "It is unacceptable to have post-operative patients back on the field, even doing sit-ups, if this has not been approved by the physician. I have had numerous parents express their concern and even disgust with the method in which you are treating the players. Unfortunately it sounds as if there is a fear as opposed to a respect."

The letter was copied to District Athletic Director, Steve Moor, and Dr. Robert Keighley, whose affiliation with the District at the time is unknown. The Defendants knew or should have known of this record.

38.  Sometime on or about 2001, reports of harassment and intimidation by Doug Frye were delivered to the Board of Education by at least three assistant football coaches. These reports were delivered to and recorded in writing by then-president of the Board of Education, Rees McKee, and to Board of Education member, John Lampert.

39.  These harassment reports were made by Defendant James Hollman (an assistant football coach under Doug Frye at the time), as well as by assistant coaches Ed Cybak and Tom Yingling. Interviews of the reporting coaches/complainants were conducted by at least two members of the Board of Education.

40.  The harassment reports provided to the Board of Education alleged harassment, excessive use of profanity and a complete disregard for athletes' injuries by

Defendant Doug Frye. The board members' notes from the reports indicate, in part, as follows:

> "Jim [Hollman] related that the use of profanity by Frye was pervasive. They had begun counting the number of times he swore. They had counted 100 times in one hour many times. This seems rather incredible, but was corroborated by Ed [Cybak]. The swearing was so common place that the boys in football discussions used profanity and nothing was said about their language."
>
> ***
>
> "Boys with injuries were chastised and berated. The injuries were not properly addressed, they would rather play hurt and say anything than to be the object of his ire. [Unnamed student] was berated for complaining of his injuries and had been severely chastised in front of the team and was called a "pussy" by Frye."
>
> ***
>
> "Players were not properly treated for injuries and were ostracized if they complained to the point of kids dragging themselves around the field not able to pick up their injured leg."
>
> "I believe the current count is 7 or 8 coaches that have disassociated themselves with our football program, one of them after only one year. This should be a red flag."

41. Then-Superintendent of the District, Paul Blaine, was informed of the complaints and interviews conducted by the members of the Board of Education. No investigation was ever conducted. Doug Frye was never disciplined by the Board of Education and no information about the reports was placed in his personnel file. The Defendants knew of these reports.

42. It is also believed that Tony Roob, a former employee and coach of the District, raised concerns about Doug Frye's treatment of football players to the Board of Education sometime on or about 2001. No investigation was ever conducted, Doug Frye was never disciplined by the Board of Education and no information

12

about the report was placed in the coach's personnel file. Defendants knew or should have known of Roob's report.

43. Doug Frye resigned from the District in 2009 for unknown reasons. No investigation was completed and no disciplinary action was taken against the coach while he was employed at St. Marys. Nothing about the reports of harassment against students was placed in his personnel file.

### Doug Frye Employment and Discipline at Wapakoneta

44. After leaving St. Marys, Doug Frye was employed as head football coach in the Wapakoneta City School District beginning in the 2010-11 school year.

45. Sometime in the fall of 2012, audio was captured of Doug Frye berating members of the football team after they lost a game. Upon information and belief, the audio was provided to administrators of the Wapakoneta City School District and/or the Ohio Department of Education. The recording was also made available to the public through a local news source.

46. On September 5, 2012, Defendant Doug Frye received a written reprimand from Wapakoneta Superintendent, Keith Horner, indicating that the coach "used the 'F' word repeatedly" and "referred to our kids' actions as 'pussies.'" The document was a public record placed in the coach's personnel file. Defendants knew or should have known of this record.

### Police Reports and Ohio Department of Education Discipline

47. On September 7, 2012, police reports were filed with the Wapakoneta Police Department by four Wapakoneta football players and two parents. The reports

provided, in part, that the coach called the athletes "pussies" on a daily basis and told them they were "worthless, losers and dumbasses." The reporting students indicated that the coach disregarded athletes' injuries and forced injured players to run as punishment for missing practice or weightlifting sessions. The police reports and investigative files were public records maintained by the Wapakoneta Police Department. Defendants knew or should have known of these reports.

48.  Defendant Doug Frye was thereafter disciplined by the Ohio Department of Education ("ODE") on June 5, 2013 for using "inappropriate and degrading comments to students while serving as football coach" at Wapakoneta City Schools. The discipline imposed by ODE required ongoing reports to be made to ODE by any employer of Doug Frye in order to report on whether the coach had engaged in any "conduct unbecoming an educator."

49.  The Consent Agreement issued by ODE was a public record maintained by ODE. Defendants knew of this record.

**Doug Frye Re-Hiring at St. Marys City Schools**

50.  Despite all of the warning signs and public records of discipline, the Defendant Board of Education re-hired Doug Frye as head football coach in January, 2014.

51.  The District's football team had a losing record during the coach's absence, including a three-year period in which the team lost 21 straight games. Doug Frye had a reputation in the community for "tough-nosed football" and winning, which appealed to the Defendants.

52.  Defendant-Superintendent Brown ignored all of the very public warning signs and recommended to the Board of Education that the coach be re-hired.

53.  At the time of the hiring, several members of the community had expressed concern about the hiring decision to Defendants Board of Education, Brown and Hollman, both orally and in writing. Many concerns were expressed during public board meetings. All of the concerns were either ignored or rejected by the Defendants Board of Education, Brown and Hollman, despite the fact that the concerns were consistent with the well-known and well documented disposition of Defendant Doug Frye.

54.  Because Defendant Doug Frye had never been disciplined for his harassing behavior while employed at St. Marys, and because the District brought the coach back again to "save" its football team, the coach's behavior was reinforced and the coach continued "motivating" students in the same harassing manner.

55.  Upon his return to St. Marys, Defendant Doug Frye immediately continued with using derogatory terms and gender stereotypes to motivate his players. At one summer practice, the coach publically berated one male player struggling during conditioning by claiming that the player should "go home and suck on his mommy's titties."  This was done in front of several players.

56.  Defendant Doug Frye stated on several occasions to the Plaintiffs that "pussy parents raise pussy kids."

57.  Defendant Doug Frye repeatedly told his players that they should play through injuries and used his son as an example. Doug Frye would regularly claim that his

son (Koby) played football with a broken back, indicating to his players that anything less was weak and unacceptable.

**Plaintiff Chance Hicks**

58.   Plaintiff Hicks was a football player in the District. In the 2013-14 school year, Defendant Doug Frye's first year back at St. Marys, Hicks was a starting defensive end and tackle on the team.

59.   Plaintiff Hicks, like the other student-Plaintiffs, was subjected to regular and repeated harassment based on gender stereotypes, namely traditional notions of masculinity, during the 2014-15 school year. Because he was not "tough enough" according to the coaches, Plaintiff Hicks was repeatedly referred to as "pussy," "pussycake," and "bitch," among other derogatory and demeaning terms used by the Defendant coaches.

60.   Plaintiff Hicks had surgery on his shoulder in February, 2014 well before his senior football season started. He was instructed by his doctor to refrain from any contact until the start of the football season, on or about August, 2014. Despite receiving medical information with this instruction, Defendant Doug Frye pressured Hicks to participate in "helmets only" practices during the summer.

61.   Although the "helmets-only" practices were supposed to be free from contact, it was common for the practices to include full contact hitting—at the urging of Defendant Doug Frye. The practices came to be known as "bumping" practices by members of the team. The practices were dangerous and put all members of the team at risk. A portion of one bumping practice was caught on video by a local

16

news station when Doug Frye was interviewed. The video was broadcast on the news and showed a hard hit delivered and taken by players wearing only helmets.

62. In June of 2014, Hicks practiced as instructed and seriously re-injured his shoulder when taking a hit from two teammates. Hicks was rolling on the ground, crying in pain. When Defendant Bo Frye saw Hicks, he told him to get up, called him a "little bitch" and made him run laps as punishment for not being able to participate in practice. Hicks ran laps for approximately 20 minutes, icing his shoulder as he ran.

63. When Defendant Doug Frye came to the field near the end of practice, he required Hicks to participate in end-of-practice sprints with the team, over the objections of at least one other assistant coach who witnessed the injury.

64. Hicks visited the hospital after the re-injury and was placed in a sling. Hicks was in excruciating pain and could not sleep or participate in football practices during the following week. Because of his absence from the summer practices, Hicks was kicked off the football team. Hicks learned of his removal from the team after Doug Frye instructed teammates to clean out his locker.

65. Under Ohio High School Athletic Association regulations, practices cannot be mandatory until August 1 and full contact practices cannot be held until August 7 (when full pads can be worn). Defendant Doug Frye and Bo Frye knew or should have known of the regulations, but intentionally disregarded them. The Defendants Board of Education, Brown and Hollman were aware of the violations, but did nothing to stop them.

17

66. Information about the incident involving Chance Hicks was provided to the Board of Education, Brown and Hollman by Plaintiffs Joshua Chisholm and David Lininger on December 22, 2015, and in writing by Hicks himself on January 20, 2016.

67. Hicks was never contacted by the Board of Education in response to his complaint and no action was ever taken to address the harassment he alleged.

68. Plaintiff Hicks suffered severe physical, psychological, emotional and mental damage as a result of the actions and/or omissions of the Defendants.

**Plaintiff Dane Chisholm**

69. Plaintiff Dane Chisholm was a senior captain on the District's football team during the 2015-16 school year. Plaintiff Dane Chisholm was a starter for the team at the positions of nose tackle and longsnapper. Chisholm earned special mention honors from the WBL league during the 2014-15 school year, his junior year.

70. Plaintiff Dane Chisholm, like the other student-Plaintiffs, was subjected to regular and repeated harassment based on gender stereotypes, namely traditional notions of masculinity and femininity, during the 2014-15 and 2015-16 school years.

71. Throughout the 2014-15 and 2015-16 school years, Dane Chisholm was regularly harassed and humiliated by Defendants Doug Frye and Bo Frye. Chisholm was repeatedly called a "cancer," a "pussy," a "bitch" and a "loser." Chisholm was targeted more often by Doug Frye because he often outwardly resisted the coach's harassment and name-calling.

72. On at least two occasions, Plaintiff Dane Chisholm was instructed to fist fight with his teammates by Defendant Bo Frye and another assistant coach.

73. At regular practices during the season, Plaintiff Dane Chisholm and others were instructed by coaches to fight other players. On more than one occasion, Defendant Bo Frye instructed Chisholm to "go get in a fight." In response to this environment created by the Defendants, at one practice, Plaintiffs Dane Chisholm, Jase Green and Levi Ginter were involved in a multi-student brawl between the offensive and the defensive.

74. In off-season drills nicknamed "bloody nose football" or "towel wars," players regularly, without pads or helmets, hit one another in order to gain possession of a makeshift football (fashioned from a towel). The Defendant coaches were present during these drills and did nothing to stop the assaults. These sessions were conducted in private, usually in the locker room, over the off-season winter months. They were used by the coaches as a way to "build toughness."

75. Plaintiff Dane Chisholm was required to participate in full-contact, helmets-only, "bumping" practices along with all other members of the team.

76. On one occasion, Plaintiff Dane Chisholm came to practice with severe bronchitis because he did not want to miss practice and face the consequences. Defendant Doug Frye heard Chisholm coughing hard, and exclaimed that, if he coughed again, the entire team would be required to run. When Chisholm coughed again (involuntarily), the entire team was punished by being required to run hills.

77.     On another occasion, Plaintiff Chisholm was required to run up and down hills for 45 minutes as punishment for mistakenly telling another player that they were not supposed to wear helmets during practice. While Chisholm was running, Defendant Bo Frye referred to Chisholm as a "cancer" on the team and solicited a vote from his teammates about whether Chisholm should stay on the team. The vote was unanimous in favor of Chisholm staying.

78.      The next occurrence occurred during the second-to-last game of the 2015-16 season, Plaintiff Dane Chisholm's senior year. During a game against Wapakoneta (the coach's former team), Chisholm snapped the ball to the punter slightly low and to the punter's side. The punter dropped the ball and the play led to a Wapakoneta score. St. Marys lost the game by a score of 49-7.

79.     Immediately after the game, Defendant Doug Frye told other players that Chisholm *intentionally misdirected the snap*. In the heat of the moment, Doug Frye allowed the team captains to announce that Chisholm was kicked off of the team. Defendant Doug Frye thereafter specifically asked players, including close friends of Chisholm, whether they were "with us [the team]," in an effort to turn the players against Chisholm.

80.     Plaintiff Dane Chisholm was shamed, harassed and humiliated, and lost the chance to play the final game of his senior season with his teammates. Chisholm was provided no avenue to dispute the dismissal. There is no procedure in which fellow athletes can remove another player from the team.

20

81.  Defendant Doug Frye regularly selected student scapegoats for losses and turned other players against them. Doug Frye regularly referred to Dane Chisholm and other select players as "leftover trash from Greg Phillips," the team's former coach.

82.  Following the removal of Chisholm from the team, Defendant Doug Frye "blacked out" all of Chisholm's figures on the team photos in the locker room. Players were instructed by Defendant Doug Frye not to associate with Dane Chisholm.

83.  An in-person and written complaint was made by Dane Chisholm's father, Plaintiff Joshua Chisholm, on December 22, 2015. Defendants Brown, Hollman or the Board of Education took no action to stop the harassment.

84.  Plaintiff Chisholm suffered severe physical, psychological, emotional and mental damage as a result of the actions and/or inactions of the Defendants.

**Plaintiff Levi Ginter**

85.  Plaintiff Levi Ginter, like the other student-athlete Plaintiffs, was subjected to regular and repeated harassment based on gender stereotypes, namely traditional notions of masculinity and femininity, during the 2014-15 and 2015-16 school years. Plaintiff Ginter was repeatedly referred to as "pussy," among other derogatory and demeaning terms used by the Defendant coaches. Plaintiff Ginter was regularly referred to by Defendant Doug Frye as the "biggest bitch on the team."

86.  Plaintiff Levi Ginter badly injured his right knee during the first football game of the 2015-16 season. The injury was obvious, but the Defendant coaches continued

21

to rotate Ginter into the game. The knee was severely swollen during and immediately after the game, causing Ginter to use crutches.

87.    On the bus ride home from the game, Defendant coach Doug Frye indicated to Plaintiff Ginter that he should not go to the doctor because "he had the whole season." It was well known to all players, including Plaintiff Ginter, that players should not go to any doctor without first talking to the coaches.

88.    Plaintiff Ginter urged his parents not to call the doctor because he feared that he would face retaliation from the coach(es) for visiting a doctor without permission.

89.    Plaintiff Ginter's mother, Angela Ginter, contacted team trainer Angie Brown about her concern for the injury. Ms. Brown said that she would "keep an eye on the injury," but that she did not believe it was a tear.

90.    Defendant Doug Frye pressured Plaintiff Ginter to return to practice during week five of the season despite it being clear that the knee had not healed. Plaintiff Ginter complied with the direction of Defendant Doug Frye and practiced and played on an injured knee for the remainder of the season. Plaintiff Ginter hobbled in pain for the rest of the season, at practice and during games.

91.    Upon the conclusion of the football season, Plaintiff Ginter visited a doctor and determined that he had in-fact seriously injured his knee and that the knee would require surgical repair.

92.    Plaintiff Ginter suffered severe physical, psychological, emotional and mental damage as a result of the actions and/or omissions of the Defendants.

22

**Plaintiff Jase Green**

93. Plaintiff Jase Green, like the other student-athlete Plaintiffs, was subjected to regular and repeated harassment based on gender stereotypes, namely traditional notions of masculinity and femininity, during the 2014-15 and 2015-16 school years.

94. Plaintiff Green was repeatedly referred to as a "pussy" and "bitch" among other derogatory and demeaning terms used by the Defendant coaches.

95. Plaintiff Green suffered targeted and persistent harassment and humiliation by Defendant Doug Frye because he resisted the coaches' treatment and because the coaches did not believe he was "tough enough."

96. Prior to the first game of the 2015-16 season, Plaintiff Green injured his hip in practice. Defendant Doug Frye repeatedly told Green to "stop limping" and "quit being a pussy."

97. Plaintiff Green suffered severe physical, psychological, emotional and mental damage as a result of the actions and/or inactions of the Defendants.

**Plaintiff R.L. (a minor)**

98. Plaintiff R.L. was a quarterback and receiver on the football team during the 2014-15 and 2015-16 school years. R.L. became a target of Defendant Doug Frye's harassment.

99. Like the other student-athlete Plaintiffs, R.L. was subjected to regular and repeated harassment based on gender stereotypes, namely traditional notions of masculinity

and femininity, during the 2014-15 and 2015-16 school years. Plaintiff R.L. was repeatedly referred to as a "pussy" by the Defendant coaches.

100. On several occasions, Defendant Doug Frye referred to R.L. as a "rich, spoiled, pretty-boy pussy." Defendant Doug Frye told other players, friends of R.L.'s, not to be "soft, like your buddy [R.L.]."

101. Defendant Bo Frye openly told players not to hang out with R.L.

102. Plaintiff R.L. suffered a shoulder separation during the 2014-15 school year and delivered a medical excuse from football for a period of four weeks. During that time, Plaintiff R.L. was referred to by Defendant coaches as a "pussy" because he could not participate.

103. Plaintiff R.L. transferred out of the District because of the harassment and retaliation he received from the Defendant coaches and other students.

104. Plaintiff R.L. suffered severe physical, psychological, emotional and mental damage as a result of the actions and/or inactions of the Defendants.

105. All student-athlete Plaintiffs, along with other teammates, were encouraged to play through injuries and told by Doug Frye that "concussions don't exist." All players, including the Plaintiffs, were instructed to talk to coaches before visiting a doctor.

106. Defendants Doug Frye and Bo Frye perceived all of the student-Plaintiffs to be less masculine than they thought they should be. The Defendant coaches regularly referred to the student-Plaintiffs with words commonly used to identify the female anatomy. The coaches also used the term "bitch" in a way to indicate that the players were not "manly" enough.

24

107.   The harassment perpetrated against the Plaintiffs was so serious that it created a hostile environment for the student-Plaintiffs and denied them the full benefit of a public education. Defendants Board of Education, Brown and Hollman never addressed the harassment, but instead recklessly, wantonly and intentionally denied or ignored it.

**Plaintiffs Joshua Chisholm and David Lininger**

108.   Plaintiff Joshua Chisholm is the natural father of Plaintiff Dane Chisholm.

109.   Plaintiff Joshua Chisholm suffered severe psychological, mental and emotional distress because of the actions and/or inactions of Defendants, specifically including the failure of Defendants to properly investigate his complaint, protect his identity and/or prevent retaliation.

110.   Plaintiff Joshua Chisholm was forced to sell his house and relocate his family out of St. Marys despite being a lifelong resident of the city. Plaintiff Joshua Chisholm was forced to transfer his minor daughter to another school district to avoid additional harassment and retaliation for the reports made against Defendants Doug Frye and Bo Frye.

111.   Plaintiff Joshua Chisholm suffered a loss of society, consortium, companionship, care, and assistance because of the effect that Defendants' actions or inactions had on his minor son, Plaintiff Dane Chisholm.

112.   Plaintiff Joshua Chisholm suffered economic damages because of the action and/or inaction of Defendants, including the forced relocation of his family.

113.   Plaintiff David Lininger is the natural father of Plaintiff R.L.

114.  Plaintiff David Lininger suffered severe psychological, mental and emotional distress because of the actions and/or inactions of Defendants, specifically including the failure of Defendants to properly investigate his complaint, protect his identity and/or prevent retaliation.

115.  Plaintiff David Lininger was forced to relocate his family out of St. Marys despite being a lifelong resident of the city.

116.  Plaintiff David Lininger was forced to transfer his two minor sons to another school district to avoid additional harassment and retaliation for the reports made against Defendants Doug Frye and Bo Frye.

117.  Plaintiff David Lininger suffered a loss of society, consortium, companionship, care, and assistance because of the effect that Defendants' actions or inactions had on his minor son, Plaintiff R.L.

118.  Plaintiff David Lininger suffered economic damages because of the action and/or inaction of Defendants, including the forced relocation of his family.

**Complaints by the Plaintiffs**

119.  All Plaintiffs collectively submitted written complaints of harassment to Superintendent Brown and Athletic Director Hollman on December 22, 2015. The complaints are attached as Exhibit A.[1] Plaintiff Chance Hicks submitted a written complaint to Brown and Hollman, through counsel, on January 20, 2016. Hicks' complaint is attached hereto as Exhibit B.

---

[1] Redactions have been made to the exhibits to protect the identity of non-party students.

120.   In addition to the written complaints, Plaintiffs Joshua Chisholm and David Lininger met with Defendants Brown and Hollman on December 22, 2015 to report the circumstances leading to the complaints and the negative environment surrounding the football program.

121.   The Board of Education initially demanded that Plaintiffs meet in-person with Defendant Doug Frye in order to submit a valid complaint against him. The Board of Education had a policy and practice, pursuant to a collective bargaining agreement with its unionized employees, of requiring complaining parties to first meet in-person with any employee against whom a complaint was made. This policy had the natural effect of discouraging Plaintiffs, as well as other students/parents, from filing bullying and/or harassment complaints against employees of the District.

122.   Plaintiffs rejected the in-person requirement and requested to meet with Defendants Brown and Hollman without Doug Frye. The District relented and proceeded without the coach present.

123.   Through the use of an "independent investigator" (so described by the District's administration), Superintendent Brown concluded that the harassment reported by the Plaintiffs was unsubstantiated. Plaintiffs allege that the investigation was biased and superficial, and failed altogether to address the complaints made by the Plaintiffs.

124.   The contracted investigator only spoke with a handful of football players who were identified by the school administration as "truthful," refused to allow the

complaining parties to discuss the harassment allegations at all, and failed altogether to consider the history of harassment by Defendant Doug Frye at St. Marys and elsewhere.

125.  The investigator and the Defendants also failed to consider, acknowledge and/or recognize that students involved in coaching abuse situations are often psychologically manipulated into defending their abusive coaches. As explained by author Jennifer Margaret Fraser, Ph.D:

> "[A]s soon as a teacher refers to students as "retards" or "pussies" whether it is in a math class or during a basketball practice…the power imbalance between student and teacher is exponential; the intent to harm is conveyed by the insulting, humiliating terms used; no reasonable argument can convince that these terms assist athletes on improving their skills, learning techniques, or developing confidence; the power to bench players, to ignore them, to control plays, to choose positions, to grant awards and scholarships create the ideal conditions for further aggression that may escalate until students turn a blind eye to others' suffering."[2]

126.  Plaintiff Chance Hicks was never contacted by the investigator or school officials. The investigator also failed to interview any former complaining parties about previous harassment complaints against the coach, most notably Defendant Hollman. The investigator did not allow the interviewee Plaintiffs to discuss the fact that players were forced to participate in full contact practice without pads. The investigator never inquired about whether the coaches referred to the Plaintiffs as "pussies" or "bitches" as alleged, and therefore never addressed the allegations at all.

---

[2] Jennifer Margaret Fraser, *Teaching Bullies, Zero Tolerance on the Court or in the Classroom*, Motion Press (2015), referencing Barbara Coloroso, *The Bully, the Bullied, and the Not-So-Innocent Bystander*, updated edition, Harper Collins: 2015.

127.   On February 8, 2016, Plaintiffs collectively appealed the Superintendent's decision to the Board of Education. With no further inquiry, the Board of Education affirmed the determination of Superintendent Brown and the assigned investigator at its meeting on March 9, 2016.

128.   The official minutes from the March 9, 2016 meeting reflect that one Board of Education member, Robert Valentine, abstained on the vote and made the following comment: "I feel caught between a rock and a hard spot with this subject. I am not 100% satisfied with the information available at this time. Therefore, I cannot in good consciousness vote either yes or no, therefore, I will exercise the only other option available to me and abstain."

129.   The Board of Education took no additional action on the Plaintiffs' complaints in violation of its Anti-Harassment Policy.

**Retaliation Against the Plaintiffs**

130.   Plaintiffs were subjected to retaliation for reporting the harassment. Despite agreeing to keep the names of the complaining parties confidential, Defendant Brown and/or Hollman disclosed the Plaintiffs' identities to coaches, including Doug Frye, on the very day that the initial complaint was submitted. As a result, Plaintiffs were shunned, harassed and retaliated against by coaches and community members.

131.   On the evening of December 22, 2015, immediately following the initial meeting, the wife of an assistant football coach grabbed Plaintiff David Lininger by the back of his head and hair at a high school basketball game and threatened him for

reporting Doug Frye. The coach's wife announced to the nearby crowd in the bleachers that, "this is Dave Lininger, the guy who wants to get Coach Frye fired." She then insisted that Lininger move his seat away from her and her family's seat, even though they had arrived to the game after Lininger. This was reported to the District, but no action was taken.

132.  All Plaintiffs were further harassed when the District released the results of its "independent investigation" to the local newspaper. This harassment and retaliation came primarily through a social media page dedicated to St. Marys football, and was in some instances directed by District employees, former board members, school contractors and students.

133.  Comments urged the Plaintiffs to move out of the District, to "suck it up." Other claimed that, "we are Roughriders, not pussies." One commenter indicated that there are, "too many parents raising pussy kids these days that can't take a punch." Many comments implied threats of violence against the Plaintiffs and attacked the Plaintiffs' character.

134.  Another comment by a former Board of Education member indicated that Plaintiffs Joshua Chisholm and David Lininger reported Doug Frye to ODE, which is confidential under Ohio law. Others identified the student-complainants, even though Brown and Hollman agreed to keep the identities confidential.

135.  The Defendants Board of Education, Brown and Hollman were all well aware of the retaliation, but did nothing to prevent or stop it.

136.    The District was also aware that a group of football supporters, including student and staff, had designed and printed a St. Marys Roughrider football shirt that read "Suck it up Buttercup" in direct response to the report made by the Plaintiffs. Defendants did nothing to stop it or prevent students from wearing the shirts at school.

137.    The Defendants failure to properly address the harassment by coaches had the effect of creating a hostile environment and increasing the retaliation and subsequent harassment that Plaintiffs suffered from members of the community, including from employees of the school and students.

**Board of Education Policies**

138.    The Board of Education's Bullying Policy 5517.01 defines harassment, intimidation, or bullying as:

> "any intentional written, verbal, electronic, or physical act that a student or group of students exhibits toward another particular student(s) more than once and the behavior both causes mental or physical harm to the other student(s) and is sufficiently severe, persistent, or pervasive that it creates an intimidating, threatening, or abusive educational environment for the other student(s)."[3]

The repeated acts of Defendants Doug Frye and Bo Frye fit within the definition, as they were intentional, intimidating, threatening and abusive, and caused mental harm to Plaintiffs.

139.    The Board of Education's Anti-Harassment Policy 5517 requires bullying and harassment training as follows:

---

[3] Board of Education Policy 3362 (applicable to employee harassment) similarly prohibits harassment, bullying and retaliation.

"The Board promotes preventative educational measures to create greater awareness of unlawful discriminatory practices. The Superintendent or designee shall provide appropriate information to all members of the School District community related to the implementation of this policy and shall provide training for District students and staff where appropriate. All training, as well as all information, provided regarding the Board's policy and harassment in general, will be age and content appropriate."

Defendant Board of Education failed to require, provide and implement training as required under their own policies and as required under Ohio Revised Code Sections 3313.666 and 3313.667, despite known harassment and the known disposition of Defendant Doug Frye.

140.    The Board of Education's Policy 5517 provides:

"All students, administrators, teachers, staff, and all other school personnel share responsibility for avoiding, discouraging, and reporting any form of unlawful harassment."

The Board of Education's Policy 5517 continues:

"State law requires any school teacher or school employee who knows or suspects that a child with a disability under the age of twenty-one (21) or that a child under the age of eighteen (18) has suffered or faces a threat of suffering a physical or mental wound, disability or condition of a nature that reasonably indicates abuse or neglect of a child to immediately report that knowledge or suspicion to the county children's services agency. If, during the course of a harassment investigation, the Compliance Officer or a designee has reason to believe or suspect that the alleged conduct reasonably indicates abuse or neglect of the Complainant, a report of such knowledge must be made in accordance with State law and Board Policy."

Defendants Brown, Hollman and Bo Frye failed to avoid, discourage and report known mental abuse as required under the Board of Education policies and

pursuant to their requirements as educators under Ohio Revised Code Section 2151.421.

141. The Board of Education's Policy further provides that, "any act of retaliation against a person who has made a report or filed a complaint alleging unlawful harassment, or who has participated as a witness in a harassment investigation is prohibited." Defendants failed to protect against retaliation by failing to take action against employees, students, and contractors for known harassment and retaliation against Plaintiffs.

142. Board of Education Bullying Policy 5517.01 provides:

> "Students, parents/guardians, and school personnel may make informal or anonymous complaints of conduct that they consider to be harassment, intimidation, and/or bullying by verbal report to a teacher, school administrator, or other school personnel."

> "Individuals who make informal complaints as provided above may request that their name be maintained in confidence by the school staff member(s) and administrator(s) who receive the complaint. Anonymous complaints shall be reviewed and reasonable action shall be taken to address the situation, to the extent such action may be taken that (1) does not disclose the source of the complaint, and (2) is consistent with the due process rights of the student(s) alleged to have committed acts of harassment, intimidation, and/or bullying."

Defendants Brown and Hollman failed to protect the identities of the Plaintiff-complainants despite a request for anonymity by the Plaintiffs. Plaintiffs suffered serious retaliation as a result.

143. The Board of Education had a policy and practice, pursuant to a collective bargaining agreement, of requiring complaining parties to first meet in-person

with any employee against whom a complaint was made. This policy was in conflict with the foregoing Board of Education policies and discouraged students/parents from filing bullying and harassment complaints against employees of the District.

144.    Following the Plaintiffs' appeal to the Board of Education, the Board of Education took no additional action to investigate the complaints. The Board of Education never spoke with complainants about the appeal. This is a violation of the Board of Education's Anti-Harassment Policy, specifically wherein it provides: "The Board will investigate all allegations of unlawful harassment and, in those cases where unlawful harassment is substantiated, the Board will take immediate steps to end the harassment, prevent its reoccurrence, and remedy its effects."

145.    Defendant Board of Education had inadequate policies, practices and procedures to deal with harassment and bullying, and/or failed to implement its policies. Defendant Board of Education failed to properly train and explain to school personnel their obligations concerning bullying and harassment under its policies, as well as under state and federal law.

146.    Defendant Board of Education, and the Defendant employees, had they been properly trained, would have recognized the impact of the victims and importance of a comprehensive investigation of all of athletes. As stated by Dr. Alan Goldberg:

> When you're in an abusive situation you end up feeling scared a lot of the time. This fear is usually related to what the coach may say or do if you mess up or fail. The fear that you feel also compels you to

> want to keep things to yourself. Abusive coaches use this fear to manipulate athletes and prevent them from talking about the coaching situation with other adults who might be able to help.[4]

147. Plaintiffs have been physically, emotionally, mentally and/or psychologically damaged due to the continued harassment and retaliation caused by the action of Defendants in re-hiring Defendant Doug Frye despite numerous reports of harassment against students. Plaintiffs have also been damaged due to Defendants' disclosures of the Plaintiffs' identities to third parties.

148. The Defendant Board of Education failed to supervise Defendant Doug Frye despite numerous reports of student harassment. Beyond a lack of supervision, the Board of Education allowed Defendant Doug Frye to close practices and meet with students privately, creating a more dangerous situation for the student-Plaintiffs. The potential for the specific type of harm suffered by Plaintiffs was known and ignored by the Board of Education.

149. A special relationship existed between the Board of Education and the student-Plaintiffs. The Board of Education increased the harm to the Plaintiffs because of its intentional or reckless actions and its deliberate indifference to known harassment by Defendants Doug Frye and Bo Frye.

150. All of Defendants' actions stated herein created a culture that supported the bullying, harassment, taunting and abuse suffered by the Plaintiffs. Defendants' actions and failure to address the harassment reports increased the harassment of

---

[4] Dr. Alan Goldberg, *Coaching Abuse: The dirty, not-so-little secret in sports.* https://www.competitiveedge.com/ "coaching-abuse-abuse-dirty-not-so-little-secret-sports"

Plaintiffs. The Board of Education failed to communicate at all with Plaintiffs or take any action on the Plaintiffs' appeal, despite at least one member expressing his concern that the Board of Education was not provided with adequate information.

151.    Among other constitutional violations, Defendants' actions violated the student-Plaintiffs' constitutional right of bodily integrity and the parent-Plaintiffs' constitutional right to direct the education of their children.

**COUNT I – Violation of Substantive Due Process Under the 14th Amendment
Through 42 U.S.C. Section 1983
Asserted Against All Defendants**

152.    Plaintiffs incorporate by reference each of the paragraphs written above as if fully set forth herein.

153.    The actions of all Defendants constitute a violation of Plaintiffs' constitutional right to substantive due process pursuant to the Fourteenth Amendment of the U.S. Constitution, in that the Defendants' reckless and/or intentional conduct, as described herein, injured Plaintiffs in a way that shocks the conscience.

154.    Defendants increased the risk of harm to Plaintiffs by re-hiring Defendant Doug Frye despite being aware of harassment against students and negative treatment of student-athletes. Defendants further increased the risk of harm to Plaintiffs by creating an environment where harassment and retaliation complaints were ignored or dismissed. Defendants increased the risk of harm by allowing Defendant Doug Frye, a known harasser, to conduct closed practices and private sessions to the exclusion of the school administration and the public. Defendants

36

failed to supervise the coach despite receiving numerous reports of the coach's harassing behavior.

155.  Defendants took no steps, or inadequate steps, to address the severe and pervasive harassment that went on for years. Reasonable persons in the Defendants' positions would have concluded that the sex-based discrimination was unconstitutional.

156.  As a direct result of the actions and conduct of Defendants, Plaintiffs suffered and continue to suffer extreme emotional pain and suffering, loss of educational opportunities (in the case of the student-Plaintiffs), and a loss of companionship with their sons (in the case of Plaintiffs Joshua Chisholm and David Lininger).

**COUNT II - Violation of Equal Protection Under the 14th Amendment Through 42 U.S.C. Section 1983 Asserted Against All Defendants**

157.  Plaintiffs incorporate by reference each of the paragraphs written above as if fully set forth herein.

158.  The actions of all Defendants, in permitting and failing to stop the relentless harassment of Plaintiffs on the basis of sex constitute a violation of the Equal Protection clause of the Fourteenth Amendment to the U.S. Constitution.

159.  Defendants took no steps, or inadequate steps, to address the severe and pervasive harassment that went on for years. Reasonable persons in the Defendants' position would have concluded that the persistent, sex-based discrimination was unconstitutional.

160.   As a direct result of the actions and conduct of Defendants, Plaintiffs suffered and continue to suffer extreme emotional pain and suffering, loss of educational opportunities, and a loss of companionship with their sons (in the case of Plaintiffs Joshua Chisholm and David Lininger).

**COUNT III – Supervisory Liability Through 42 U.S.C. Section 1983
Asserted Against Defendants Board of Education, Brown and Hollman**

161.   Plaintiffs incorporate by reference each of the paragraphs written above as if fully set forth herein.

162.   Defendants Board of Education, Brown and Hollman, acting as supervisors of Defendants Doug Frye and Bo Frye, were aware that the coaches were engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to the Plaintiffs and citizens like the Plaintiffs.

163.   Defendants' response to the knowledge was so inadequate as to demonstrate deliberate indifference to or tacit authorization of the alleged offensive practices.

164.   There was an affirmative causal link between Defendants' inaction and the particular injury suffered by the Plaintiffs.

165.   As a direct result of the actions and conduct of Defendants Brown and Hollman, Plaintiffs suffered and continue to suffer extreme emotional pain and suffering, loss of educational opportunities, and a loss of companionship with their sons (in the case of Plaintiffs Joshua Chisholm and David Lininger).

## COUNT IV - First Amendment Retaliation Through 42 U.S.C. Section 1983
## Asserted Against All Defendants

166.    Plaintiffs incorporate by reference each of the paragraphs written above as if fully set forth herein.

167.    Plaintiffs were engaged in a constitutionally protected activity when they advocated on their own behalf (or on behalf of their children) and reported harassment to the Superintendent, Athletic Director and Board of Education.

168.    Defendants' action in releasing the names of the reporting Plaintiffs, retaliating against Plaintiffs and failing to address known retaliation caused the Plaintiffs to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity. Defendants' actions were motivated, at least in part, as a response to the exercise of Plaintiffs' constitutional rights.

169.    Reasonable persons in the Defendants' position would have concluded that the actions of Defendants were unconstitutional.

170.    As a direct result of the actions and conduct of Defendants, Plaintiffs suffered and continue to suffer extreme emotional pain and suffering, loss of educational opportunities, and a loss of companionship with their sons (in the case of Plaintiffs Joshua Chisholm and David Lininger).

**COUNT V – Violation of the Standard in *Monell v. Dept. of Social Services*
Through 42 U.S.C. Section 1983
Asserted Against Defendant Board of Education**

171.   Plaintiffs incorporate by reference each of the paragraphs written above as if fully set forth herein.

172.   The actions of Defendant Board of Education, in failing to properly train its officials, coaches and teachers in proper methods of recognizing, responding to and preventing bullying and harassment, and in permitting ongoing bullying and harassment, constitute a violation of Defendant Board of Education's obligations to maintain lawful policies and procedures pursuant to *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978).

173.   Reasonable persons in the Defendants' position would have concluded that maintaining such policies, practices and procedures that allowed and/or perpetuated the harassment of students by staff members was unconstitutional.

174.   As a direct result of the actions and conduct of Defendants, Plaintiffs suffered and continue to suffer extreme emotional pain and suffering, loss of educational opportunities, and a loss of companionship with their sons (in the case of Plaintiffs Joshua Chisholm and David Lininger).

**COUNT VI – Gender-Based Harassment in Violation of Title IX
Asserted Against the Board of Education**

175.   Plaintiffs incorporate by reference each of the paragraphs written above as if fully set forth herein.

176.  Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

177.  Defendant Board of Education had actual knowledge of the sex-based harassment as stated herein.

178.  Plaintiffs were treated differently from female students because of traditional notions of masculinity and femininity. Defendant Board of Education addressed harassment of female students differently because Defendant believed that males, including Plaintiffs, should be tough enough to tolerate the harassment.

179.  Defendant Board of Education ignored repeated sex-based verbal and mental harassment by Defendants Doug Frye and Bo Frye in the form of "bitch," "pussy" and "pussycake."

180.  Defendant Board of Education failed to provide adequate due process to Plaintiffs and protect Plaintiffs from known retaliation after Plaintiffs filed a sex-based complaint, in violation of Title IX.

181.  Defendant Board of Education was deliberately indifferent to the known acts of harassment by Defendants Doug Frye and Bo Frye, and the harassment was so severe, pervasive, and objectively offensive that it deprived the student-Plaintiffs of access to educational benefits or opportunities provided by the school.

182.  As a direct result of the actions and conduct of Defendant Board of Education, Plaintiffs suffered and continue to suffer extreme emotional pain and suffering,

loss of educational opportunities, and a loss of companionship with their sons (in the case of Plaintiffs Joshua Chisholm and David Lininger).

**COUNT VII – Gross Negligence, Bad Faith, Reckless, Wanton and Intentional Conduct Under Ohio Revised Code Section 2744.03 Asserted Against the Individual Defendants**

183.    Plaintiffs incorporate by reference each of the paragraphs written above as if fully set forth herein.

184.    The actions of the individual Defendants, as enumerated herein, constitute gross negligence, bad faith, reckless, wanton or intentional conduct in violation of Ohio Revised Code Section 2744.03(A)(6).

185.    As a direct result of the actions and conduct of Defendants, Plaintiffs suffered and continue to suffer extreme emotional pain and suffering, loss of educational opportunities, and a loss of companionship with their sons (in the case of Plaintiffs Joshua Chisholm and David Lininger).

**COUNT VIII – Negligent Hiring, Supervision and Retention Under Ohio Law Asserted Against the Board of Education**

186.    Plaintiffs incorporate by reference each of the paragraphs written above as if fully set forth herein.

187.    Defendant Board of Education recklessly and/or intentionally re-employed Defendant Doug Frye despite being aware that the coach was not fit for employment. Defendant Board of Education recklessly and/or intentionally failed to supervise and retain Defendant Doug Frye after the re-hiring.

188.   The Board of Education knew or could have discovered the coach's incompetence through reasonable investigation.

189.   Defendant Doug Frye's actions in harassing the Plaintiffs and retaliating against the Plaintiffs caused Plaintiffs' injuries.

190.   The actions of Defendant Board of Education in hiring, supervising and retaining the coach were the proximate cause of Plaintiffs' injuries.

**COUNT IX – Intentional Infliction of Emotional Distress**
**Asserted Against All Defendants**

191.   Plaintiffs incorporate by reference each of the paragraphs written above as if fully set forth herein.

192.   All Defendants, through their acts and omissions, intended to cause emotional distress to the Plaintiffs. Defendants' conduct was extreme and outrageous, beyond the bounds of decency and was such that the conduct should be considered utterly intolerable in a civilized society.

193.   Defendants were the proximate cause of Plaintiffs' psychiatric injuries and the mental anguish suffered was of a nature that no reasonable person in the Plaintiffs' position could be expected to endure it.

**COUNT X – Negligent Infliction of Emotional Distress**
**Asserted Against All Defendants**

194.   Plaintiffs incorporate by reference each of the paragraphs written above as if fully set forth herein.

195.    All Defendants, through their acts and omissions, negligently or recklessly caused emotional distress to the Plaintiffs, as Plaintiffs personally suffered from harassment and witnessed the harassment of others.

196.    Defendants were the proximate cause of Plaintiffs' injuries.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1. A jury trial for all issues pursuant to F.R.C.P. 38(b);

2. That each named Defendant be required to answer within the time prescribed by law;

3. A declaration that the acts and conduct of all Defendants constitute violations of Plaintiffs' constitutional, statutory and common-law rights;

4. An award to Plaintiffs against all Defendants, jointly and severally, an appropriate amount of compensatory damages and, against the individual Defendants, an appropriate amount of punitive damages;

5. Equitable relief requiring Defendant Board of Education to adopt harassment policies, procedures and practices commensurate with guidance issued by the United States Department of Education, Office of Civil Rights;

6. An award to Plaintiffs against all Defendants, jointly and severally, reimbursement for appropriate court costs and reasonable attorney fees;

7. An award to Plaintiffs for any other relief the court deems appropriate.

Respectfully submitted,

*/s/ Mark A. Weiker*
Mark A. Weiker (0086413)
Leslie A. Albeit (0086377)
ALBEIT WEIKER, L.L.P.
250 E. Broad Street, 10th Floor
Columbus, Ohio 43215
T: (614) 519-6918
F: (614) 417-5081
E: mark@awlawohio.com
E: leslie@awlawohio.com
*Counsel for Plaintiffs*

45

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Respectfully submitted,

*/s/ Mark A. Weiker*
Mark A. Weiker (0086413)
Leslie A. Albeit (0086377)
ALBEIT WEIKER, L.L.P.
250 E. Broad Street, 10th Floor
Columbus, Ohio 43215
T: (614) 519-6918
F: (614) 417-5081
E: mark@awlawohio.com
E: leslie@awlawohio.com
*Counsel for Plaintiffs*